UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRAVIS BEECH,

    Plaintiff,                                                            Hon. Robert J. Jonker

v.                                                                               Case No. 1:12-CV-908

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 36 years of age on his alleged disability onset date. (Tr. 11, 152). He successfully completed high school and worked previously as a sorter, production assistant, and truck driver. (Tr. 20, 39, 184).

Plaintiff applied for benefits on June 4, 2010, alleging that he had been disabled since August 25, 2005,[1] due to the effects of a leg amputation, depression, anxiety, high blood pressure, and asthma. (Tr. 152-54, 183). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 90-151). On February 13, 2012, Plaintiff appeared before ALJ Janet Alaga-Gadigian. (Tr. 27-89). In a written decision dated March 9, 2012, the ALJ determined that Plaintiff was not disabled. (Tr. 11-22). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-6). Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

In August 2005, Plaintiff was involved in a motorcycle accident after which he experienced an above-the-knee amputation of his left lower extremity. (Tr. 275). Plaintiff resumed

---

[1] Plaintiff later amended his disability onset date to December 31, 2009, "the last full month he worked." (Tr. 31-32).

working full-time after his injury and worked until December 2009. (Tr. 31-32, 39-45). Plaintiff did not stop working due to any physical or emotional impairment, but because he was laid-off. (Tr. 39-40, 183).

On January 2, 2009, Plaintiff was examined by Dr. Cynthia Schuler. (Tr. 266-69). Plaintiff reported no physical or medical difficulties, but instead simply wanted "to have [a] form filled out." (Tr. 266-67). Plaintiff reported that he "exercises fairly regularly." (Tr. 267). Plaintiff's depression was "stable" and his blood pressure was "in the target range." (Tr. 266). His asthma was also "stable." (Tr. 266). The results of a physical examination were unremarkable. (Tr. 267-68).

On March 24, 2010, Plaintiff was examined by Dr. Schuler. (Tr. 261-64). The results of a physical examination were unremarkable. (Tr. 262-63). Plaintiff reported that his depression was "stable" and that he exercises regularly. (Tr. 262-63). Treatment notes dated April 21, 2010, indicate that Plaintiff was a "no show" for a scheduled appointment with Dr. Schuler. (Tr. 259). The doctor noted that this was the third time in the past nine months that Plaintiff failed to attend a scheduled appointment. (Tr. 259).

On May 3, 2010, Plaintiff was examined by Dr. Schuler. (Tr. 253-58). Plaintiff reported that his asthma had "improved," but that his depression "ha[d] worsened." (Tr. 253). The results of a physical examination were unremarkable and Plaintiff's blood pressure was "satisfactory." (Tr. 255-58). Plaintiff's depression medications were modified. (Tr. 257). On May 21, 2010, Plaintiff reported that his depression "has worsened." (Tr. 249-50). Dr. Schuler noted, however, that Plaintiff had discontinued taking his prescribed medication. (Tr. 249-50). Plaintiff's medication regimen was again modified. (Tr. 249-50). Treatment notes dated July 21, 2010,

4

indicate that Plaintiff's "depression has improved. . .but his anxiety is still terrible." (Tr. 309). Plaintiff's medication regimen was further modified. (Tr. 312).

On August 10, 2010, Plaintiff participated in a consultive examination conducted by Neil Reilly, M.A. (Tr. 275-80). Plaintiff reported that he "feels depressed much of the time" and "does not have a lot of energy." (Tr. 275). Plaintiff also reported experiencing "increased anxiety." (Tr. 275). Plaintiff reported that he has a good relationship with his wife and children and "spends most of his day" caring for his children and "doing things around the house." (Tr. 277). Plaintiff also reported that he enjoys playing video games, watching television, working on the computer, and playing with his kids. (Tr. 277). Plaintiff appeared depressed, but a mental status examination was otherwise unremarkable. (Tr. 278-79). Plaintiff was diagnosed with "mild to moderate" mood disorder. (Tr. 279).

On August 22, 2010, Dr. Schuler reported that Plaintiff was not experiencing any "stump complications" and was able to ambulate effectively with his prosthetic leg. (Tr. 323).

On September 2, 2010, Plaintiff participated in a consultive examination conducted by Dr. Timothy Gates. (Tr. 289-91). Plaintiff reported that he can sit for 60-90 minutes and stand for 60 minutes. (Tr. 289). Plaintiff also reported that he can walk only 100 feet before experiencing shortness of breath. (Tr. 289). The doctor observed that Plaintiff was able to ambulate "using his prosthetic in a fashion that does favor his left side however he does not appear to be grossly weak or unstable." (Tr. 290). An examination of Plaintiff's extremities revealed "full" range of motion with no evidence of edema, tenderness, erythema, or effusion. (Tr. 290). An examination of Plaintiff's hands revealed "normal" grip strength and "full dexterity." (Tr. 290). Muscle testing

5

revealed 5/5 strength throughout. (Tr. 291). Plaintiff also exhibited "intact" motor and sensory functioning. (Tr. 291).

Treatment notes dated October 17, 2011, indicate that Plaintiff was able to successfully ride a hand-powered recumbent bicycle. (Tr. 339). As a result, Plaintiff purchased a "recumbent style handcycle." (Tr. 339). Plaintiff reported that he was "motivated to use this bicycle as part of a lifelong fitness program and [to] be able to ride a bike as part of his family recreation." (Tr. 339).

On December 7, 2011, Plaintiff was examined at Mary Free Bed Rehabilitation Hospital. (Tr. 324-25). Plaintiff reported that he wears his prosthetic leg "all day long" and "is very active, taking care of his 6 and 4-year old." (Tr. 324). He reported that aside from experiencing "discomfort…with prolonged standing," he does not experience "any residual limb discomfort from the prosthesis." (Tr. 324). An examination of Plaintiff's left lower extremity revealed 5/5 strength and "functional" range of motion with no evidence of edema or other abnormality. (Tr. 324). Plaintiff's prosthesis-aided gait was described as "stable." (Tr. 325).

On January 17, 2012, Dr. Schuler reported that Plaintiff can sit "continuously up to 2 hours or occasionally up to 6 hours." (Tr. 340). The doctor reported that Plaintiff can likewise stand "continuously up to 2 hours or occasionally up to 6 hours." (Tr. 340). Dr. Schuler also reported that Plaintiff can frequently (i.e., "continuously up to 8 hours") lift up to 25 pounds. (Tr. 340). The doctor further reported that Plaintiff can sometimes (i.e., "continuously up to 2 hours or occasionally up to 6 hours") lift 50 pounds. (Tr. 340).

On January 19, 2012, Plaintiff was examined by Douglas Bentley, Ed.D. (Tr. 342-46). Plaintiff exhibited a "flat affect" and "endorsed thoughts and feelings of hopelessness;

loneliness; being disliked and mocked; depression; feeling like he has no emotions; and suicidal ideation." (Tr. 344). Plaintiff also reported that he is "very angry and aggressive with poor impulse control." (Tr. 344). Dr. Bentley diagnosed Plaintiff with (1) major depression, recurrent, severe, and (2) generalized anxiety disorder with panic attacks. (Tr. 345). The doctor identified Plaintiff's GAF score as 28.[2] (Tr. 345). Dr. Bentley concluded that Plaintiff was "totally disabled" because "[h]e cannot maintain concentration or memory long enough to function in a job." (Tr. 345). Dr. Bentley further concluded that Plaintiff's "panic, paranoia about others, as well as obsessive thoughts and depressed behavior preclude his ability to do any type of job." (Tr. 345).

Dr. Bentley also completed a report describing Plaintiff's ability to perform mental work-related activities. (Tr. 347-49). Specifically, the doctor assessed Plaintiff's limitations in 18 separate categories encompassing (1) making occupational adjustments; (2) making performance adjustments; (3) making personal/social adjustments; and (4) functional limitations. (Tr. 347-49). Plaintiff's limitations were characterized as "extreme" in eight categories; "marked" in seven categories; and "moderate" in three categories. (Tr. 347-49).

---

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 28 indicates that the individual's "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." DSM-IV at 34.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[3]1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from (1) status post left leg amputation above the knee; (2) asthma; (3) obesity; (4) mood disorder with mixed anxiety and depression; and (5) tinnitus, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14-15).

The ALJ next determined that Plaintiff retained the capacity to perform light work[4] subject to the following limitations: (1) Plaintiff cannot stand/walk more than four hours during an 8-hour workday; (2) he can never push or pull with his left lower extremity; (3) he cannot operate foot controls; (4) he cannot climb ladders, ropes, or scaffolds; (5) he can occasionally stoop, crouch, kneel, squat, and climb ramps and stairs; (6) he can frequently balance, but never crawl; (7) he cannot work with more than moderate exposure to noise; (8) he cannot work with more than concentrated exposure to environmental irritants;[5] (9) he cannot be exposed to hazardous machinery

---

[4] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

[5] Considering that the ALJ found that Plaintiff suffers from asthma, her subsequent RFC finding (and hypothetical question to the vocational expert) limiting Plaintiff to *no more than* concentrated exposure to environmental irritants appears incongruous as such would appear to constitute no limitation at all. The Court can only speculate whether the ALJ simply misstated the extent to which she found Plaintiff limited in this regard. Nevertheless, such does not require remand or other relief for at least two reasons. First, the jobs identified by the vocational expert do not involve exposure to environmental irritants to a degree inconsistent with Plaintiff's asthma. (Tr. 82-84). Moreover, Plaintiff has not asserted this particular issue as a basis for relief and has, therefore, waived such. *See, e.g., Porzillo v. Department of Health and Human Services*, 369 Fed. Appx. 123, 132 (Fed. Cir., Mar. 12, 2010) (claimant "waves any arguments that are not developed"); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 537 n.25 (10th Cir. 2000) (arguments "superficially" developed are waived); *Financial Resources Network, Inc. v. Brown & Brown, Inc.*, 2010 WL 4806902 at *30 n.29 (D. Mass., Nov. 18, 2010) (same).

or unprotected heights; (10) he is limited to unskilled work with an SVP rating of 1 or 2;[6] (11) he is limited to jobs with few workplace changes; and (12) he can have only occasional interaction with the general public, co-workers, and supervisors. (Tr. 15).

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Rich Riedl.

The vocational expert testified that there existed approximately 10,500 jobs in the lower peninsula of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 82-84). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837

---

[6] SVP ratings measure the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *See* Dictionary of Occupational Titles, Appendix C, available at http://www.occupationalinfo.org/appendxc_1.html (last visited on December 9, 2013). A job with an SVP rating of 1 corresponds to a job that a typical worker can perform after a "short demonstration only." A job with an SVP rating of two corresponds to a job that a typical worker can perform after "anything beyond short demonstration up to and including 1 month." *Id.*

10

F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The vocational expert further testified that if Plaintiff were further limited to sedentary work, there still existed 5,600 jobs in the lower peninsula of Michigan that Plaintiff could perform despite his limitations. (Tr. 82-85). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.	**The ALJ Properly Evaluated the Medical Evidence**

Plaintiff first asserts that he is entitled to relief because the ALJ failed to accord controlling weight to opinions (detailed below) expressed by Dr. Schuler and Dr. Bentley. Plaintiff asserts that because Dr. Schuler and Dr. Bentley were his treating physicians, the ALJ was required to afford controlling weight to their opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is

unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

A. Dr. Schuler

Dr. Schuler opined that Plaintiff experiences "severe limitations as to pace and concentration" that would result in Plaintiff being "off task 20% or more percent of the time." (Tr. 340). The ALJ afforded "limited" weight to this opinion. As the ALJ accurately observed, "after [Plaintiff's] initial accident and recovery, he has had only minimal, conservative treatment for his injury and other medical problems." (Tr. 18). As the ALJ further observed, Plaintiff's "mental

disorders have not required major intervention," but have instead responded to medication. (Tr. 19).

As the evidence detailed above reveals, Dr. Schuler's opinion is inconsistent with Plaintiff's extensive activities, not to mention her own treatment notes. As the ALJ concluded, the record simply does not support the conclusion that Plaintiff experiences work preclusive limitations in his ability to maintain pace or concentration. To the extent that Plaintiff experiences limitation in these areas, such is adequately accounted for in the ALJ's RFC determination. In sum, the ALJ's conclusion to afford less than controlling weight to Dr. Schuler's opinion is supported by substantial evidence.

### B. Dr. Bentley

Dr. Bentley reported that Plaintiff experienced "extreme" limitations[7] in several areas of functioning including his ability to (1) deal with the public; (2) deal with work stresses; (3) behave in an emotionally stable manner; and (4) maintain concentration, persistence, or pace. (Tr. 347-49). Dr. Bentley further reported that Plaintiff experienced "marked" limitations[8] in several areas of functioning including (1) relate to co-workers; (2) interact with supervisors; (3) use judgment; (4) function independently; (5) maintain attention/concentration; and (6) demonstrate reliability. (Tr. 347-49). The ALJ afforded "no weight" to Dr. Bentley's "unreasonable" opinion.

As is well recognized, the treating physician doctrine "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time

---

[7] The form Dr. Bentley completed defined "extreme" limitations as "a degree of limitation that is incompatible with the ability to do any gainful activity." (Tr. 347).

[8] The form Dr. Bentley completed defined "marked" limitations as "limitations that seriously, but not completely, interfere with the ability to function independently, appropriately and effectively on a sustained basis." (Tr. 347).

will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once." *Kornecky v. Commissioner of Social Security*, 167 Fed. Appx. 496, 506 (6th Cir. 2006). When assessing whether an opinion from a care provider is entitled to deference, the question is not whether the care provider later established a "treating physician" relationship with the claimant, but instead whether such relationship existed as of the date the opinion in question was rendered. As the Sixth Circuit has observed:

> But the relevant inquiry is not whether [the doctor] might have become a treating physician in the future if [the claimant] had visited him again. The question is whether [the doctor] had the ongoing relationship with [the claimant] to qualify as a treating physician *at the time he rendered his opinion*."

*Id.*

Accordingly, "a single visit [to a care provider] does not constitute an ongoing treatment relationship." *Id.* Moreover, "depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship." *Id.* at 506-07.

Because Dr. Bentley examined Plaintiff on only one occasion, his opinion is not entitled to any particular deference. Even if that were not the case, the result would be the same as the ALJ properly rejected the doctor's opinion. As the ALJ concluded, Dr. Bentley's opinion is not supported by anything in the medical record and is inconsistent with Plaintiff's reported activities and conservative treatment. The ALJ's decision, therefore, to afford less than controlling weight to Dr. Bentley's opinion is supported by substantial evidence.

14

**II.		Plaintiff does not Suffer from a Listed Impairment**

The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled. Plaintiff argues that he is entitled to relief because he satisfies section 1.05(B) of the Listing of Impairments.

Section 1.00 of the Listing addresses disorders of the musculoskeletal system, including those resulting from "traumatic. . .events." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00. Section 1.05(B) concerns amputation of "one or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00(B)(2)(b), which have lasted or are expected to last for at least 12 months." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.00(B).

Section 1.00(B)(2)(b) defines "inability to ambulate effectively" as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02(B)(2)(b)(1). Ineffective ambulation "is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* To ambulate effectively, claimants "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out the activities of daily living." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 1.02(B)(2)(b)(2).

The ALJ rejected Plaintiff's claim that he satisfied Section 1.05(B) of the Listing, concluding that Plaintiff did not suffer from an inability to ambulate effectively. Specifically, as the

15

ALJ noted, Plaintiff was examined at Mary Free Bed Rehabilitation Hospital on December 7, 2011. (Tr. 324-25). Plaintiff reported that he wears his prosthetic leg "all day long" and "is very active, taking care of his 6 and 4-year old." (Tr. 324). He reported that aside from experiencing "discomfort...with prolonged standing," he does not experience "any residual limb discomfort from the prosthesis." (Tr. 324). An examination of Plaintiff's left lower extremity revealed 5/5 strength and "functional" range of motion with no evidence of edema or other abnormality. (Tr. 324). Plaintiff's prosthesis-aided gait was described as "stable." (Tr. 325). The results of this particular examination are entirely consistent with the evidence of record, including Plaintiff's own reports of extensive activity. As for Dr. Schuler's January 17, 2012 opinion that Plaintiff satisfied the requirements of Section 1.05(B), (dkt. #341), the ALJ properly rejected such on the ground that whether a claimant is disabled is a matter left to the commissioner. *See* 20 C.F.R. § 404.1527(e)(1). The ALJ also rejected this particular opinion on the ground that it enjoys no support in the record. In sum, the ALJ's conclusion that Plaintiff does not satisfy Section 1.05(B) of the Listing of Impairments is supported by substantial evidence.

### III.        The ALJ Properly Evaluated Plaintiff's Impairments

As previously noted, the ALJ determined that Plaintiff suffers from the following severe impairments: (1) status post left leg amputation above the knee; (2) asthma; (3) obesity; (4) mood disorder with mixed anxiety and depression; and (5) tinnitus. Plaintiff asserts, however, that he is entitled to relief because the ALJ failed to also find that he suffers from the additional severe impairments: (1) hypertension; (2) gastroesophageal reflux disease (GERD); (3) vitamin D deficiency.

16

The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Kirkland v. Commissioner of Social Security*, - - - Fed. Appx. - - -, 2013 WL 2233881 at *2 (6th Cir., May 22, 2013) ("so long as the ALJ considers all the individual's impairments, the failure to find additional severe impairments. . .does not constitute reversible error"); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (same); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same).

Here, the ALJ determined that Plaintiff suffered from a severe impairment at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record. There is no indication in the record that Plaintiff's (1) hypertension; (2) gastroesophageal reflux disease (GERD); or (3) vitamin D deficiency imposes on him any limitations which are inconsistent with his RFC. Thus, even if it is assumed that the ALJ erred in failing to find that these particular impairments were severe, such does not call into question the substantiality of the evidence supporting the ALJ's decision. This argument is, therefore, rejected. *See Shinseki v. Sanders*, 556 U.S. 396, 407 (2009) (recognizing that the harmless error doctrine is intended to prevent reviewing courts from becoming "impregnable citadels of technicality"); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the

remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: December 19, 2013 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge